'[Ryan *v.* Ulmer.]

# Ryan *versus* Ulmer.

1. A pork packer in Dubuque, Iowa, sold to a dealer in Pottsville, Pa., "five car loads fully cured sweet pickled shoulders, f. o. b. Dubuque." Upon arrival at Pottsville the goods were found to be unmerchantable, and in action of assumpsit by the vendee upon the implied warranty in the above contract the court charged that the defendant was bound to furnish pork that was "sweet and sound and in fit condition to be sold in the trade." Held to be error: the contract implied no warranty whatever of quality, and the vendee had no right to recover damages for the alleged breach.

2. In an action for the breach of warranty in the sale of goods shipped from a distant point, the vendee having no opportunity of testing the quality of the goods at the place of delivery, evidence is admissible of the bad quality of the goods when received, coupled with expert testimony to show the means used for its preservation and that if good when shipped it ought not to have spoiled by the way.

January 14th, 1885. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ. CLARK, J., absent.

ERROR to the Court of Common Pleas, No. 3, of *Philadelphia county:* Of January Term, 1884, No. 290.

Assumpsit, by Jacob Ulmer against Willam Ryan and

[Ryan v. Ulmer.]

Thomas J. Ryan, trading as William Ryan & Son, to recover damages for a breach of an alleged implied warranty of certain meat sold by the defendants to the plaintiff.

The narr. was in the following form: " . . . . . That in consideration that the said plaintiff at the special instance and request of the said defendants would buy of the said defendants a large quantity of cured pork for the food of man at and for a certain price or sum of money, to wit, &c., to be therefor paid by the said plaintiff. They the said defendants undertook and then and there faithfully promised the said plaintiff that the said cured pork then was good, sound, sweet, merchantable and wholesome and in a condition fit for human consumption. And the plaintiff avers, that he, confiding in the said promise and undertaking of the said defendants, did afterwards, to wit, &c., buy the said cured pork of the said defendants, and then and there paid him for the same, the said sum of money, nevertheless the said defendants contriving and fraudulently intending to injure the said plaintiff did not perform or regard their said promise and undertaking so by them made as aforesaid, but thereby craftily and subtly deceived and defrauded the said plaintiff in this, to wit: that the said cured pork at the time of the making of the said promise and undertaking of the said defendants was not sound, sweet, merchantable and wholesome and in a condition fit for human consumption, but on the contrary thereof was at the time unsound, not sweet, unmerchantable, and not in a condition fit for human consumption, whereby the said cured pork became and was of no use or value to the said plaintiff; and he the said plaintiff hath been put to great charges and expenses of his money in and about the said cured pork for payment of freight thereon, in taking care thereof, in making allowances for the worthless quality thereof to persons to whom he had sold a portion of the same, in the whole amount to a large sum of money, to wit: the sum of five hundred dollars, at Philadelphia county aforesaid."

Pleas, non-assumpsit, payment with leave, &c., and set-off.

On the trial, before FINLETTER, J., the facts appeared as follows: William Ryan & Son were pork packers at Dubuque, Iowa. Jacob Ulmer, the plaintiff, was in the same business and conducted a meat smoking establishment at Pottsville, Pa. Roloson, a provision broker in Chicago, as agent for both parties, negotiated a sale from Ryan to Ulmer of certain pork, from which this controversy arose. On August 3d, 1881, Ryan & Son wrote to Roloson, " You may offer five car loads fully cured pickled shoulders, average not above twelve pounds, at not below six and one half cents, f. o. b., Dubuque." On August 9, 1881, Roloson, in pursuance of an order from Ulmer,

bought for him two car loads of the shoulders referred to in
this letter of instructions and reported the sale to Ryan & Son.
" I sold to-day two cars S. S. (sweet pickled) shoulders.  Make
them 12 ave. if you can at $6.85 f. o. b., Dubuque.  Ship them
to my order, Pottsville, via. Star Union line ; better ship about
12th to 14th."  The pork was shipped on August 16th, 1881,
to order of R. W. Roloson, Pottsville, and the bill of lading
was sent him.  On its receipt on August 17th he drew on
Ulmer for the price and charges, $2,808.19, and attached to
the draft the bill of lading and invoice.  The draft arrived at
Pottsville on August 19th, and was paid by Ulmer, who re-
ceived the meat afterwards, on August 23d.  When opened
the cars were found to contain about five hundred pounds of
ice.  The meat was packed in tierces, some of which were full
of pickle and some about one third or one half full.  The
pickle was thick and ropy, instead of being thin, an indication
that it had been kept too long.  The meat was placed in
Ulmer's refrigerator, where the temperature was from 40° to
46°.  Some of the meat was unpacked and after soaking
placed in smoke.  In the course of the next day and the day
following the meat was found to be sour and unfit for use, and
then the remainder was found to have spoiled also.  Nearly
all was returned by Ulmer's customers, and the total loss in-
curred for freight, return charges, &c., amounted to $1,239.59.

The defendants showed that the meat before shipment was
inspected by their own inspector, Thomas Duffy, who testified
that at that time the meat was sound, sweet, merchantable and
fit for human consumption.  That sufficient ice was packed in
the cars to last until they reached Chicago.  It did not appear
whether or not they were re-iced at that place except from the
fact that they were found on arrival at Pottsville to contain at
least the usual quantity of ice.  The plaintiff, Ulmer, was
offered as a witness to show :   " That on arrival of this meat
at Pottsville, on opening of the cars, the cars were found to
contain a considerable quantity of ice ; that the meat being
taken out of the cars, opened and prepared for smoking and
smoked it was found to be bad, unmerchantable meat ; that
other parts of the meat were prepared for smoking and found
to be bad before smoke ; that other was treated in different
ways, in order to avoid the bad smelling of the meat, and
others were not smoked at all.  In other words, the bad qual-
ity of the meat, and if the meat had been sound and merchant-
antable when it left Dubuque, and some of the ice remaining
in the cars on its arrival at Pottsville, it would have been
good."

Objected to and objection overruled.  This with other sim-
ilar offers of expert witnesses, formed the subject of the 1st
to 12th assignments of error.

[Ryan *v.* Ulmer.]

The court charged inter alia, as follows: . . . . . The plaintiff's claim in this case is for damage which he has suffered by reason of the meat being unsound when he received it. The terms of the contract under which these parties acted have been offered in evidence, and they are comparatively simple. It is, however, for me to give an interpretation of that contract so far as the legal responsibilities of the parties are concerned and to give that in brief, it is this:—that the defendant was bound to furnish under the terms of the contract meat that was sweet and sound and in fit condition to be sold in the trade. Therefore the only question that you will be called upon to consider in this case is the condition of the meat at the time it was put upon the cars at Dubuque. I do not intend to enter at all events at any length, into the consideration of the facts in this case. They are entirely for you, but all the testimony that has been given on either side is and ought to have been directed to that particular question—was or was not the meat sound when it was put upon the cars at Dubuque. In considering a question of this kind of course it is proper that facts antecedent to that time should be considered by the jury, and facts subsequent, because they may have a very important bearing upon the question. Therefore all that we know in relation to this shipment of meat, all that has been said about it here, is proper for your consideration, but all for the express purpose of ascertaining its condition at the time of shipment. . . . . . If upon the testimony you are satisfied that this meat was in an unsound condition when it was put upon the cars at Dubuque, your verdict, of course, ought to be for the plaintiff, and as there is no dispute upon the question of the amount of damages, of course you will not be troubled in ascertaining what that is, because I understand it is conceded that if the plaintiff recovers he is entitled to recover the amount specified by the witnesses on the stand—about $1,200. If, however, on the other hand, this meat was put upon the cars in proper condition, sweet and sound, then your verdict must be for the defendant.

Verdict for the plaintiff for $1,239.59 and judgment thereon. Whereupon defendant took this writ assigning for error the admission of the evidence noted above, and also

13. The court erred in entering judgment for plaintiff below, because the contract proved on the trial was substantially a different contract from that averred in the narr.

14. The court erred in entering judgment for plaintiff below, because there was no sufficient evidence of the contract of warranty.

15. The court erred in entering judgment for the plaintiff below, because there was no evidence of a breach of contract proved at the trial of the cause.

*J. Willis Martin*, (with whom was *Benjamin P. Wilson*,) for plaintiff in error.—There was no implied warranty of quality: Chandelor *v.* Lopus, 1 S. Lead. Cases, 238; Borrekins *v.* Bevan, 3 Rawle, 23; Kirk *v.* Nice, 2 Watts, 367; Fraley *v.* Bispham, 10 Barr, 320; Wetherill *v.* Neilson, 8 Harris, 448; Port Carbon Iron Co. *v.* Groves, 18 P. F. S., 149; Whitaker *v.* Eastwick, 25 Id., 229; Warren *v.* Philadelphia Coal Co., 2 Norris, 437. Nor was there warranty that the pork should be "salable" or "merchantable." The defendants were not manufacturers: Lawrence *v.* Allen, 7 How., 794; *In re* Capital Company, 18 Bank Reg, 319. By the terms of the contract Dubuque was the place of delivery; the condition of the goods on arrival at Pottsville was irrelevant: Dickson *v.* Zizinie, 10 C. B., 602; Leggat *v.* Brewing Co., 60 Ill., 158. The contract was not proved as laid. The narr. avers an executed contract. The evidence proves an executory contract and a retention of the goods after inspection. The narr. also avers a sale of "cured pork for the food of man" the evidence showed a sale of meat to be sold again as merchandise.

*Rudolph M. Schick*, for the defendant in error.—No exception was taken by plaintiff in error to the charge of the court. It was however correct. There was no opportunity given to inspect the meat. Duffy was the vendor's inspector; and did not act for the vendee. The rule of caveat emptor does not apply: Edwards *v.* Hathaway, 1 Phila., 547; Dodd *v.* Kirk, 2 W. N. C., 260; Boyd *v.* Wilson, 2 Norris, 319; Howard *v.* Hoey, 23 Wend., 350; Swett *v.* Shumway, 102 Mass., 365; Gardiner *v.* Gray, 4 Camp., 144; Jones *v.* Jones, 8 M. & W., 431, and other cases reviewed in Benjamin on Sales. This is a case "where the manufacturer undertakes to supply goods manufactured by himself or in which he deals but which the vendee has not had the opportunity of inspecting when it is implied that he shall supply a merchantable article." In Whitaker *v.* Eastwick, 25 P. F. S., 231, the vendee testified that he was acquainted with the quality of the coal sold. In Kirk *v.* Nice, 2 Watts, 367, the written contract specified that the iron sold should be made of a certain kind of ore. That excluded other stipulations. In Iron Co. *v.* Groves, 18 P. F. S., 149, the goods were ordered for a special purpose. In Neilson *v.* Wetherill, 8 Harris, 452, the soda was open to inspection. In Fraley *v.* Bispham, 10 Barr, 324, it was not alleged that the tobacco was unsalable. The condition of the meat at Pottsville was evidence to show its condition when shipped at Dubuque: Judson *v.* Easton, 58 N. Y., 664; Beer *v.* Walker, 46 L. J. C. P., 677.

[Ryan v. Ulmer.]

Mr. Justice GORDON delivered the opinion of the court, March 23d, 1885.

The action in this case was in assumpsit on an implied warranty of goods sold by the defendants below to the plaintiff.

The sale was of 140 tierces sweet pickled pork shoulders, deliverable on board the cars at Dubuque, and was negotiated through R. W. Roloson, a provision broker in the city of Chicago, who acted as the common agent of both parties. Both plaintiff and defendants were packers and dealers in pork; the place of business of the latter was at Dubuque, and that of the former in Pottsville of this state. The transaction, then, in brief, stands thus: Ulmer ordered the goods, as above stated, from Ryan & Son, and they were shipped without inspection or opportunity of inspection by him. It is true, an inspection was ordered by Roloson, but as that inspection was made by the defendants themselves through one of their employees, it was, of course, not conclusive on Ulmer. Shortly after the meat arrived at Pottsville it was found to be spoiled, so much so that it was not merchantable as human food. During the trial, a number of exceptions were taken to the evidence offered and admitted on part of the plaintiff. But as it was all pertinent to prove the probable condition of the meat when shipped at Dubuque, we cannot say that it was inadmissible. The plaintiff had no opportunity of directly testing or knowing its quality when delivered on the cars, he was therefore obliged to do the best he could by proving its bad quality when received, and showing by experts, and the means used for its preservation, that if good when shipped it ought not to have spoiled by the way. If, indeed, the sale itself raised no implied warranty of the quality of the goods delivered, the evidence was inadmissible, for in that case there could in any event be no recovery under the present state of the pleadings however bad the character of the meat when shipped. This, however, is the main point of the case, and is raised by the 13th, 14th, and 15th assignments of error. With reference to this point the court charged, that under the terms of the contract, the defendants were bound to furnish meat that was sweet, sound and in a fit condition to be sold in the trade. We have no hesitation in saying, that at all events, this was carrying the doctrine of implied warranty too far. No rule that we know of carries the doctrine quite to the length here stated. Under the English decisions, as they now stand, where the vendee has had no opportunity of inspecting the commodity, he has a right to require a salable article, but nothing more, and he cannot insist that it shall be of any particular quality or fineness: Wharton's Law of Contracts, Sec., 223. When, therefore, the learned judge of the

court below informed the jury that the meat, when delivered, must have been not only salable, but also sweet and sound, he made a statement not sustained by any authority recognized in this state, for even an express warranty could not have gone beyond what was thus stated. For this, however, we cannot reverse since it has not been assigned for error. The question then, recurs, do the facts of this case raise a warranty of any kind or degree? We think they do not. In the way of conditions of sale we have but the order of the broker on his correspondents for the shipment, to his own order, of two car loads of sweet pickled shoulders, free on board the cars at Dubuque, and the invoice forwarded by him to Ulmer setting forth the shipment, on his account, of 140 tierces S. P. shoulders. When Ulmer received this meat it was apparently in good condition; an inspection showed nothing wrong except that the pickle was not as pure as it should have been, and it was not until some hours of smoking that its bad quality was developed. How it was when shipped at Dubuque is impossible to say, and, of course, under the charge, the finding of the jury does not help us.

It may have been at that time good for present use, and yet not fit for shipping, or it may have been entirely sound and deteriorated through neglect on the way. At all events, there is no evidence that the defendants knew that it was not good when put on board the cars. Under these circumstances, we are satisfied that had the rule established by this court been followed the plaintiff would not have been permitted to recover. The case of Wetherill *v.* Neilson, 8 Har., 448, is directly in point, and would have to be overruled were we to sustain the court below. There the bill of sale was of "35 casks of soda ash, 48 per cent." The offer of proof on part of the defence was, *inter alia*, that the ash was below 48 per cent. strength; that it was not marketable, but valueless and useless, not being in fact the article it was sold for. The court below refused to entertain the offer, and ordered judgment on the ground that the defendant had shown neither an express warranty nor fraudulent representation, and that nothing short of this could prevent the plaintiff's recovery.

In this case, like that in hand, there was neither inspection of the goods nor opportunity for such inspection, so that they are in all particulars similar. A like case is that of Warren *v.* The Philadelphia Coal Company, 2 Nor., 437, in which Mr. Justice WOODWARD affirms that there is no rule more firmly imbedded in our jurisprudence than that which governs the rights of vendors and purchasers in an ordinary contract of sale of personal property. "In such a contract the vendor is subject to no implication of a warranty of the quality of the

article sold." He also adds; "The doctrine of the common law, as it was settled in Chandelor v. Lopus, Cro. Jac., 4, has been constantly and uniformly applied." The same doctrine is held by Mr. Justice MERCUR in Whitaker v. Eastwick, 25 P. F. S., 229, and also in Eagan v. Call, 10 Ca., 236. As has been said, this is the common law doctrine and is found in the case of Chandelor v. Lopus, in which case the declaration set forth, that the defendant, a goldsmith, having skill in precious stones, "had a stone which he affirmed to Lopus to be a bezoar stone, and sold it to him for a hundred pounds; *ubi revera*, it was not a bezoar stone."

Under the pleadings judgment was given for the plaintiff in the King's Bench, but was reversed in the Exchequer Chamber on the ground that the bare affirmation that the stone was a bezoar, without warranty, was no cause of action. This is perhaps, an extreme case, for here the article was not even in specie what it was sold for, nevertheless, as we have seen, it was literally followed in Wetherill v. Neilson, supra, as it was in Seixas v. Woods, 2 Caines, 48; and the latter was followed in New York in Holden v. Dakin, 4 John., 421. We understand, indeed, that both in England and New York there has been to some extent a departure from the rulings of the above cited cases, but in Pennsylvania there has been a steady adherence to the common law doctrine without any greater qualification than that found in Borrekins v. Bevan, 3 Rawle, 37, where it was held that the goods sold must be the same in kind as those mentioned in the contract of sale.

> For the reasons here given we reverse the judgment of the court below, and order a new venire.

TRUNKEY and STERRETT, JJ., dissented.